IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal No.: ELH-18-17 |
| JAMES GRAVES | |
| Defendant. | |

## MEMORANDUM OPINION

James Graves, defendant, was convicted in 2018 of conspiracy to distribute heroin, for which he is serving a sentence of sixty months' imprisonment at FCI Fort Dix, with credit dating to March 23, 2018. ECF 470. Through counsel, Graves has moved for compassionate release, pursuant to 18 U.S.C.3582(c)(1)(A)(i) (ECF 859), supported by a memorandum of law (ECF 861) (collectively, the "Motion") and exhibits. The government opposes the Motion. ECF 874. Defendant replied (ECF 887) and submitted additional exhibits.

No hearing is necessary to resolve the Motion. For the reasons that follow, I shall grant the Motion.

### I.  Background

Graves was indicted on January 11, 2018, along with eighteen others. ECF 1. A superseding indictment was filed on March 22, 2018. ECF 157. In particular, defendant was charged with conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin, in violation of 21 U.S.C. § 846 (Count One).

Graves entered a plea of guilty to Count One on December 13, 2018 (ECF 352), pursuant to a Plea Agreement. ECF 355. In the Plea Agreement, the parties contemplated a base offense level of 30, before deductions for acceptance of responsibility. *Id.* ¶¶ 6(a). The government also

agreed to recommend a reasonable sentence after consideration of the range under the advisory Sentencing Guidelines ("U.S.S.G." or "Guidelines"). *Id.* ¶ 9.

The Plea Agreement included a stipulation of facts. *Id.* at 9. According to the stipulation, Graves was a participant in the drug distribution ring known as the "Good Pussy" heroin shop (*i.e.*, the "GP heroin shop"). *Id.* From March 2017 to January 2018, he conspired with others "to obtain wholesale quantities of heroin and distribute one kilogram or more of that heroin at the street-level." *Id.* Defendant used his residence as a "stash location for heroin and the drug proceeds." Using pole cameras, law enforcement captured video evidence of Graves and his co-conspirators engaged in drug trafficking, including footage of other members of the GP heroin shop meeting defendant at or near his residence to retrieve "a supply of heroin," which occurred on "an almost daily basis." *Id.* Law enforcement also conducted a wiretap investigation in which defendant was heard "discuss[ing] the accounting of the drug proceeds for the day" and asking when one of his co-conspirators "was going to pick up the money." *Id.* Defendant stipulated that it was reasonably foreseeable to him that members of the conspiracy would distribute one kilogram or more of heroin. *Id.*

The offense at issue generally carries a mandatory minimum term of imprisonment of ten years, with a maximum of life imprisonment. ECF 467 (Amended Presentence Report, "PSR"), ¶ 84. The PSR reflects that that defendant had a final offense level of 27 and a criminal history category of I. *Id.* ¶¶ 25, 38. Therefore, defendant qualified for the safety valve under 18 U.S.C. § 3553(f) and U.S.S.G. § 2D1.1(b)(17).

Because defendant satisfied the criteria under 18 U.S.C. § 3553(f), he was not subject to the statutory minimum sentence of ten years. *Id.* His advisory Guidelines called for a sentence ranging between seventy and eighty-seven months of imprisonment. *Id.* ¶ 85.

According to the PSR, Graves had one criminal history point. ECF 467, ¶ 36. However, he had several prior convictions in state court for burglary, battery, theft, and drug possession. *See id.* ¶¶ 28-36. But, his prior convictions all occurred well before the underlying offense. Six of the nine prior convictions occurred before 1994, and the most recent one, which was for drug possession, dates to 2007. *See id.* Moreover, his prior convictions all resulted in short or suspended sentences. *See id.* The longest sentence defendant had ever received was eighteen months of imprisonment in 1982 for a burglary offense. *Id.* ¶ 28.

Sentencing was held on March 22, 2019. ECF 466. At that time, Graves was fifty-six years of age. ECF 467 at 3. The PSR reflects that he suffers from diabetes and high blood pressure, among other health conditions. *Id.* ¶¶ 64, 65. And, defendant has struggled with depression, *id.* ¶ 68, as well as substance abuse. *See id.* ¶¶ 71-74. Defendant was involved in a serious motor vehicle accident some fifteen to twenty years earlier, which injured him and took the lives of his brother and sister-in-law. *See id.* ¶¶ 66, 74. He was prescribed Percocet after the accident, and then began to struggle when the prescription was discontinued. *Id.* ¶ 74. He then "tr[ied] heroin to ease his pain," which led to daily heroin usage. *Id.*

The Court imposed a sentence of sixty months' imprisonment, with credit for time served from March 23, 2018. ECF 470. In addition, the Court imposed five years of supervised release. *Id.*

Graves is serving his sentence at FCI Fort Fix, a low-security institution. ECF 861 at 1; ECF 874 at 8; *see Find an inmate*, Federal Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited May 7, 2021). He has not incurred any disciplinary infractions while in custody. ECF 863 at 1. The submissions from both sides indicate that Graves has a projected release date of January 5, 2022. ECF 861 at 4; ECF 874 at 2; ECF 887 at 4. Curiously, the BOP website indicates

that he has a projected release date of March 30, 2022. *See Find an inmate*, *supra*. Defendant has served approximately 63% of his sentence, and approximately 78% of his sentence accounting for good time credit. Notably, he is eligible for home detention on July 8, 2021. ECF 874-1 at 2.

Graves has appended six character letters to the Motion, including those from his pastor, mother, sister, and daughter. ECF 863 at 2-7. Lawson J. Smith Jr., Pastor of the Greater Remnant Church of God in Christ in Baltimore, states that Graves is "a peaceful man" with "strong family ties," and a "a kind, loving and caring son" to his mother, who is over ninety years of age. *Id.* at 2. Graves's mother, Dorothy Garland, indicates that Graves was the child who lived near her and "always took care of [her.]" *Id.* at 3. She writes that he "sits with me, talks with me, [and] takes me out for walks," and that he "has always been the patient one." *Id.* Graves's sister, Michelle Smith, indicates that defendant has been a dependable and thoughtful son as well as "the rock of our family." ECF 863 at 4. Smith adds that her brother "needed an eye opening experience without the drugs" to help him conquer his addiction. *Id.*

Defendant asserts that he "has been drug free since his arrest on March 20, 2018." ECF 861 at 4. If released, he plans to live with Smith in Aberdeen, Maryland, "a location he chose in order to get away from the temptations of his pre-incarceration residence in Baltimore City." *Id.* Moreover, he plans to return to work for a former employer in the construction and home remodeling industry. *Id.*

Graves submitted requests for compassionate release to the Warden in the spring of 2020. *See* ECF 862 at 1-2. Those requests were denied on April 27, 2020, and June 16, 2020. ECF 861 at 1, 3.

## II. Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed."

18 U.S.C. § 3582(c); *see United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019). But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception is when the modification is "expressly permitted by statute." 18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence. Section 3582 was adopted as part of the Sentencing Reform Act of 1984. It originally permitted a court to alter a sentence only upon a motion by the Director of the BOP. *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief. *See*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

However, for many years the safety valve of § 3582 languished. The BOP rarely filed motions on an inmate's behalf. As a result, compassionate release was exceedingly rare. *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress significantly amended the compassionate release mechanism when it enacted the First Step Act of 2018 ("FSA"). *See* Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 276 (4th Cir. 2020). As amended by the FSA, 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a defendant's term of imprisonment "upon motion of

5

the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. So, once a defendant has exhausted his administrative remedies, he may petition a court directly for compassionate release. *McCoy*, 981 F.3d at 276.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," it finds that

> (i) extraordinary and compelling reasons warrant such a reduction;
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission.

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276. But, in U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might warrant compassionate release. *See McCoy*, 981 F.3d at 276. The Sentencing

Commission acted pursuant to 28 U.S.C. § 994(t), as well as § 994(a)(2)(C). *McCoy*, 981 F.3d at 276. However, as the *McCoy* Court observed, the policy statement was issued in 2006 and was last updated in November 2018, prior to the enactment of the First Step Act in December 2018. *Id.*

In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons." U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1 to U.S.S.G. § 1B1.13 defines "Extraordinary and Compelling Reasons" in part as follows:

> 1. **Extraordinary and Compelling Reasons**.—Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
>    (A)   **Medical Condition of the Defendant**.—
>
>  (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
>  (ii) The defendant is—
>
>      (I)   suffering from a serious physical or medical condition,
>
>      (II) suffering from a serious functional or cognitive impairment, or
>
>      (III) experiencing deteriorating physical or mental health because of the aging process,

>that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

Application Note 1(B) provides that age is an extraordinary and compelling reason where the defendant is at least 65 years of age, has serious physical or mental health issues, and has served at least 10 years in prison or 75% of the sentence. Application Note 1(C) concerns Family Circumstances. Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D). This is the "so-called, 'catch-all' category." *McCoy*, 981 F.3d at 276.

The BOP regulation appears at Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 2582 and 4205. However, the Court may not rely on the Program Statement. Rather, the Court must consider the Sentencing Commission's policy statements. *United States v. Taylor*, 820 F. App'x 229, 229-30 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction").

As noted, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"). However, as indicated, the policy statement in § 1B1.13 of the Guidelines was last updated in November 2018, before the enactment of the First Step Act. Thus,

8

it is only "directed at BOP requests for sentence reductions." *McCoy*, 981 F.3d at 276 (citing U.S.S.G. § 1B1.13). In other words, "[b]y its plain terms . . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." *Id.* at 282; *see also United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1108-12 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180-81 (7th Cir. 2020).

Accordingly, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283. Therefore, district courts are "'empowered…to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (quoting *Zullo*, 976 F.3d at 230).

Nevertheless, as the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582. *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, NKM-17-00003, 2020 WL 1650406, at *3 (W.D. Va. Apr. 2, 2020). If the defendant can show an extraordinary and compelling reason that renders him eligible for a sentence reduction, the Court must then consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *Dillon*, 560 U.S. at 826-27; *see also United States v. Kibble*, 992 F.3d 326, 329-30 (4th Cir. 2021) (per curiam) (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 Fed. App'x 607, 608-9 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under 18 U.S.C. § 3582(c)(1)(A), the court must consider the sentencing factors under 18 U.S.C. § 3553(a), to the extent applicable);

*United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020). But, compassionate release is a "rare" remedy. *Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020); *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019).

### III. COVID-19[1]

Defendant filed his Motion while the nation is "in the grip of a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020). That crisis is COVID-19.[2] The World Health Organization declared COVID-19 a global pandemic on March 11, 2020. *See Seth v. McDonough*, PX-20-1028, 2020 WL 2571168, at *1 (D. Md. May 21, 2020).

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic. *Id.*

That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918. *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration."). Indeed, the pandemic "has produced unparalleled and exceptional circumstances affecting every aspect of life

---

[1] The Court may take judicial notice of matters of public record. *See* Fed. R. Evid. 201.

[2] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19. *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW (last accessed June 15, 2020).

as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated*, 815 F. App'x 978 (6th Cir. 2020). For a significant period of time, life as we have known it came to a halt. For quite some time, businesses and schools were shuttered or operated on a limited basis.

The virus is highly contagious. *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh. Many people who are stricken with the virus experience only mild or moderate symptoms. But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted). As of May 7, 2021, COVID-19 has infected more than 32.6 million Americans and caused approximately 580,000 deaths in this country. *See COVID-19 Dashboard*, The Johns Hopkins Univ., https://bit.ly/2WD4XU9 (last accessed May 7, 2021).

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the virus. Those risk factors initially included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system. *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.

On June 25, 2020, July 17, 2020, and November 2, 2020, the CDC revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19. On March 29, 2021, to reflect the most recently available data, the CDC again revised its guidance. *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (Mar. 29, 2021), https://bit.ly/38S4NfY. According to the CDC, the factors that increase the risk include cancer;

<sub>
</sub><sup>
</sup>

chronic kidney disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and hypertension; HIV; being immunocompromised; liver disease; obesity, where the body mass index ("BMI") is 25 or higher; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; and substance use disorders. *Id.* The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1.

Unfortunately, there is currently no cure for the virus, although medical treatments have improved. To stem the spread of the virus, people have been urged to practice "social distancing" and to wear masks. *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020). Social distancing is particularly difficult in the penal setting, however. *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area."). Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high.").

Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others. Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020).

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe*,' WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread. *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the Bureau of Prisons ("BOP") implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."

The Department of Justice ("DOJ") has recognized the unique risks posed to inmates and employees of the BOP from COVID-19. The DOJ has adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Former Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020). Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281. In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General. *See* Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ." *Hallinan*, 2020 WL 3105094, at *9. Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ." *Id.*

On a positive note, the country has recently seen the rollout of three vaccines for COVID-19 (Pfizer, Moderna, and Johnson & Johnson). The vaccines were initially made available to health care workers, the elderly in nursing homes, and first responders. But, the criteria for eligibility has since expanded, and the vaccine is now available to all persons 16 years of age and older.

Given the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance" on January 4, 2021 (version 7.0). *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. Administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4. Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6.

The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, F*ederal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, Forbes (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/ federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f. As of May 7, 2021, the BOP had 127,782 federal inmates and 36,000 staff. And, by that date, the BOP had administered 164,598 vaccine doses to staff and inmates. *See* https://www.bop.gov/coronavirus/ (last accessed May 7, 2021).

Nevertheless, as with the country as a whole, the virus persists in penal institutions.[3] As of May 7, 2021, BOP reported that 121 inmates out of a total of 127,782 inmates, and 166 BOP

---

[3] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020) (On October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19.). On November 21, 2020, the *New York Times* reported that "U.S. correctional

15

staff out of some 36,000 staff members, currently test positive for COVID-19; 46,193 inmates and 6,751 staff have recovered from the virus; and 234 inmates and four staff members have died from the virus. Moreover, the BOP has completed 112,271 COVID-19 tests. *See* https://www.bop.gov/coronavirus/ (last accessed May 7, 2021).

With respect to FCI Fort Dix, were the defendant is imprisoned, the BOP reported as of May 7, 2021, that two inmates and two staff members tested positive for COVID-19, and 1800 inmates and ninety-one staff have recovered at the facility. In addition, 247 staff members and 1480 inmates have been inoculated with the vaccine. *See* https://www.bop.gov/coronavirus/ (last accessed May 7, 2021).

### IV. Discussion

Graves has moved for compassionate release on the ground that his medical conditions render him particularly vulnerable to COVID-19. ECF 861 at 2-3. In particular, he asserts that he suffers from Type 2 diabetes, among other conditions. *Id.*

The government concedes that that defendant's diabetes satisfies the "extraordinary and compelling" prong of the § 3582 analysis. ECF 874 at 8, 10. Accordingly, I am satisfied that defendant satisfies the "extraordinary and compelling" requirement. However, that does not end the inquiry.

---

facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems*." America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

More recently, on April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.*

Relief is appropriate under 18 U.S.C. § 3582(c)(1)(A) only if the defendant "is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). To determine whether a defendant is a danger to the community, the Court must consider the factors under 18 U.S.C. § 3142(g), including the nature and circumstances of the offense, the history and characteristics of the defendant, and the danger that release would pose to any person or the community.

The Court must also consider the factors set forth in 18 U.S.C. § 3553(a), as required by 18 U.S.C. § 3582(c)(1)(A). These include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.

Graves acknowledges the seriousness of his offense. ECF 861 at 4. But, he emphasizes that his offense did not involve allegations of violence, and he claims that he played a relatively minor role in the drug conspiracy. *Id.* In addition, defendant contends that he no longer poses a danger to the community. *Id.*

Although defendant has long struggled with drug addiction, which contributed to his offense, he asserts that he has not used drugs since March 2018, as noted. *Id.* Moreover, he "has a strong base of family and community support," as reflected in the character reference letters submitted as exhibits. According to Graves, at fifty-eight years of age, it "is highly unlikely that he will return to a life of crime." *Id.*

The government counters that defendant remains a danger to the community, highlighting his "substantial criminal history." ECF 874 at 11. With respect to both the dangerousness analysis

17

and the § 3553 factors, the government argues, in essence, that Graves's past punishments did little to deter him from criminal activity, as evidenced by his involvement in this case. *See id.* at 10-12. In its view, the lesson to take from defendant's criminal history is that his lenient sentences enabled him to "continue succumbing to his demons or engaging in conduct that harmed other people in his community." *Id.* at 11. In short, the government asserts that Graves "has never before been meaningfully held accountable for his conduct." *Id.*

As I see it, the factors under § 3553(a) and § 3142(g) weigh in favor of reducing Graves's sentence. Graves's participation in the drug conspiracy was driven largely by his own longtime drug addiction. However, he has since spent just over three years imprisoned without using drugs—an assertion that the government does not dispute. Thus, it seems reasonable to infer that defendant is well positioned to maintain a drug-free life upon release. And, participation in a substance abuse treatment program and substance abuse testing are both required conditions of defendant's supervised release. *Id.* at 4.

Graves's behavior over the past three years, while in BOP custody, is an important indicator of whether he remains a danger to the community. *See* 18 U.S.C. § 3582(c)(1)(A)(ii). Courts place significant weight on a defendant's post-sentencing conduct because it "provides the most up-to-date picture of [his] 'history and characteristics.'" *See Pepper v. United States*, 562 U.S. 476, 492 (2011) (citing 18 U.S.C. § 3553(a)(1)); *see also United States v. Scott*, CCB-95-202, 2020 WL 2467425, at *4 (D. Md. May 13, 2020). Notably, defendant has not committed any infractions during his time in custody. ECF 863 at 1.

To be sure, Graves has a checkered past, as the government points out. But, most of his prior convictions occurred long ago. Indeed, he had only one criminal history point, which rendered him eligible for the safety valve. The most recent conviction, before the current offense,

18

occurred in 2007. And, his sentence—although below the Guidelines range—is substantially longer than any prior sentence he received in the state system. Defendant has served almost two-thirds of his sixty-month sentence, and more than three-quarters of it when accounting for good time credit. Moreover, he is eligible for release to a halfway house in July.

It is also noteworthy that Graves's incarceration in the midst of a global pandemic has "sufficiently increased the severity of the sentence beyond what was originally anticipated such that the purposes of sentencing are fully met even with the proposed reduction." *United States v. Green*, TDC-10-761, 2020 WL 2992855, at *4 (D. Md. June 4, 2020); *see also United States v. Park*, No. 16-cr-00473, 2020 WL 1970603, at *5 (S.D.N.Y. Apr. 24, 2020) (noting that a sentence "that was sufficient but no greater than necessary" may now, in light of COVID-19, become "one immeasurably greater than necessary").

As I see it, Graves's incarceration since March 2018 is sufficient to serve the sentencing goals of incapacitation, deterrence, retribution, and rehabilitation. Accordingly, I find that the factors under 18 U.S.C. § 3553(a) weigh in favor of reducing his sentence to time served plus fourteen days, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), with the added requirement of six months of home confinement as a condition of supervised release.

## V. Conclusion

For the reasons set forth above, I shall grant the Motion (ECF 861). As set forth in the attached Order, I shall adopt all of the previously imposed terms and conditions of supervised release, with the added condition of a six-month period of home confinement.

An Order follows, consistent with this Memorandum Opinion.

Date: May 11, 2021                                             /s/
                                                          Ellen L. Hollander
                                                          United States District Judge